A93A2377, A93A2378. PACES PARTNERSHIP v. GRANT et al.;
and vice versa.
(442 SE2d 826)

ANDREWS, Judge.

Paces Partnership, plaintiff/tenant, appeals from the grant of summary judgment to Grant and Trust Company Bank, defendant/landlord, and defendant/landlord cross-appeals from the partial grant of summary judgment to Paces Partnership. Both appeals deal with the interpretation of a lease.

There is no dispute that, in June 1968, John W. Grant, Jr., the father of John W. Grant III, and Craigellachie Development Company, a now defunct corporation, owned approximately 30 acres bounded by Roswell Road, East Andrews Drive, West Paces Ferry Road on the north, east, and south, and adjacent realty known as Grant Estates to the west. Grant, Jr., and Craigellachie Development Company were the predecessors in title of Grant III and Trust Company. The corporation owned Tract A and Grant, Jr., owned Tracts B, C, and D of the subject property. On June 1, 1968, Grant, Jr., and the corporation signed a 50-year lease with Cousins Properties, Inc., the predecessor in interest of Paces Partnership. It is the terms of this lease which are in dispute.

Article III of the lease, entitled "Rents," provides in paragraph 7 for specific amounts of rental to be paid over the first 25 years of the lease, escalating from $48,000 in 1968 to $128,000 for the 21st through the 25th years. Rental for years 26 through 40 is to be "An amount equal to seven and one-half percent (7-½%) of the appraised value of the leased land as of the first day of the 25th year but not less than $128,000 per year." June 1, 1992 was the first day of the 25th year.

For years 41 through 50, the same formula applied with regard to the 40th year, with a minimum rental of $160,000.

Paragraph 7 further provided that "[a]ppraised value of the leased land shall be deemed to mean the fair market value of the leased land determined as though there were no improvements on the leased land and as though the leased land were not encumbered by this lease, except to the extent the use of the premises is restricted by the terms of paragraph 15 (a), (b) and (c)."[1]

Ninety-five percent of the rental was to go to Grant and five percent to the corporation and their respective successors in interest.

Article IV, paragraph 13 provided for termination of the lease if the "entire premises or any substantial part thereof" were taken by condemnation or eminent domain. If only part were taken and the untaken part remained sufficient for the tenant's use, there would be a pro rata reduction in the rental based on "that proportion of the rent otherwise payable hereunder which the market value of the land included in the premises remaining . . . bears to the market value of the land included in the premises immediately prior to the taking, the land in each instance to be valued as though it had no improvements on it."

Paragraphs 14 through 18 are contained in Article V, entitled "Improvements." Paragraph 14 (a) required the tenant to make improvements pursuant to plans and specifications attached to the lease as "Schedule III" and the tenant agreed that the "value of the improvements shall be not less than Four Million ($4,000,000) Dollars." "Value" was defined in paragraph 14 (b) as "fair market value." Paragraph 16 required the improvements to be completed by June 1, 1973.

Paragraph 15 (a) required the improvements on Tract A, located at the corner of West Paces Ferry Road and East Andrews Drive, to be "single family dwellings or townhouses, constructed in accordance with the plans attached hereto as Schedule III." No improvement could be made which lay in both Tracts A and B.

Paragraph 15 (b) dealt with the improvements on Tract B. Tract B was between Tracts A and C and wrapped around two sides of C. Construction on Tract B required a 40-foot natural buffer between Grant Estates to the west and any construction on the leased premises. No use could be made of this buffer zone. Within 75 feet of Grant Estates, only individual apartment or townhouses could be built, not extending more than 20 feet into the 75-foot strip. No improvements over two stories in Tract B were allowed, "except those units located on the northern portion of Tract B and shown on the

---

[1] Provision was made by the lease for a panel of arbitrators, one each picked by landlord and tenant and the third chosen by these two, to determine the "appraised value of the leased land."

plans approved by Landlord and attached hereto as Schedule III."

Paragraph 15 (c) provided that, until January 1, 1988, only those improvements "approved by Landlord and as set forth in the original development plans . . . [Schedule III]" could be made on Tract C. After January 1, 1988, tenant could construct new or additional apartment buildings on Tract C, "subject to paragraph 23 hereof" and with certain height limitations.[2]

Paragraph 23 is included in Article VI, entitled "Use of Premises — Repairs — Alterations — Substitution of New or Reconstructed Buildings." It provided that "Tenant shall have the right to repair, renovate, alter, add to, demolish or reconstruct as often as, and whenever it deems proper, the improvements constructed on the premises, and to substitute other improvements therefor subject to the provisions of paragraph 15 hereof. No subsequent demolition of any substantial portion of the improvements shall be permitted unless:" followed by subsections (a), (b), (c), and (d).

Subsection 23 (a) provided that any replacement of the improvements which were demolished have a value of one-and-one-half times the value at time of demolition. Subsection (b) required that architectural drawings be provided to landlord before demolition and subsection (c) required that, if tenant built, landlord would be provided with proof of bonding and other items and, if contractor built for tenant, tenant would provide landlord with copies of the contract and contractor provided bonds.

Subsection 23 (d) required that long term and interim financing commitments be obtained by tenant and that an escrow agreement be set up with a bank into which tenant would deposit the interim financing plus cash representing the difference in the lower of the two commitments and the final completion cost of the project.

*Case No. A93A2377*

Paces Partnership contended below that the phrase "appraised value of the leased land" in paragraph 7 related only to the worth of tenant's remaining 25-year "estate for years" and not to the fee.[3] Landlord contended and the court concluded that the fair market value of the land should be determined as though (i) the property was owned in fee simple, (ii) there were no improvements on the property, (iii) the lease did not exist, and (iv) the property was subject to re-

---

[2] Paragraph 15 (d), not at issue here, stated that Tract D, a roughly 1,200-foot by 500-foot rectangle at the corner of Roswell Road and East Andrews Drive, "may be developed by Tenant in any way Tenant desires."

[3] This distinction would make the difference in yearly rental between $128,000 and $1.2 million for years 26 through 40.

strictions containing the same terms as paragraphs 15 (a), (b), and (c) of the lease; provided, however, that (1) the cost of demolition and removal of existing improvements; (2) paragraph 23 as referred to in paragraph 15 (c); and (3) the fact that tenant will have a 25-year term remaining shall be given no weight in the determination.

1. First, we note that "[a] lease of lands for five years or more creates an estate for years and passes as realty in this State. Such an estate may be bought and sold as any other estate, subject to the terms and conditions of the lease. [OCGA §§ 44-6-100; 44-6-102; 44-7-1]." *Shell Petroleum Corp. v. Jackson*, 47 Ga. App. 667, 669 (1) (171 SE 171) (1933).

This conclusion, however, does not resolve the issue presented here, which is the method for computing rental under such a lease for its remaining 25 years.

2. As acknowledged by both parties below, "[t]he construction of the provisions of this lease, as with other contracts, is generally one for the court to determine as a matter of law. OCGA § 13-2-1." *Peachtree &c. Investors v. Reed Drug Co.*, 251 Ga. 692, 694 (1) (308 SE2d 825) (1983). The court will construe a contract where the language is undisputed but the meaning of that language is in dispute. OCGA § 13-2-1; *Brown v. Hitch*, 208 Ga. App. 784, 785 (1) (431 SE2d 751) (1993).

" 'It is the responsibility of the court to determine whether an ambiguity exists. (Cit.) If the contract does not require disentanglement of the language by a jury, i.e., the words used are plain and clear in their common usage, it remains the duty of the trial court to look to the language of the contract with a view to effectuating the intent of the parties.' [Cit.]" *Brown*, supra.

"In ascertaining the intent of the parties, the court should ascertain the parties' intent after considering the whole agreement and interpret each of the provisions so as to harmonize with the others. [Cit.] That is '(i)n construing contracts, it is important to look to the substantial purpose which must be supposed to have influenced the minds of the parties, rather than at the details of making such purpose effectual.' [Cit.]" *Friedman v. Friedman*, 259 Ga. 530, 532 (3) (384 SE2d 641) (1989). See *Harris County v. Penton*, 211 Ga. App. 498 (439 SE2d 729) (1993).

" 'If the intention of the parties *as of the time of executing the agreement* (is) clear, it should be enforced, even though the parties disagree as to its meaning as of the time of the litigation.' [Cit.]" (Emphasis supplied.) *Johnson v. Raatz*, 200 Ga. App. 289, 291 (407 SE2d 489) (1991).

This court takes judicial notice, OCGA § 24-1-4, that, in the standard metropolitan statistical area of metro Atlanta, the 1970 United States Census showed 1,761,492 residents. The 1990 Census

reflected a population of 2,833,511. The population of Fulton County alone increased nearly 44,000 in this same period. Obviously, this growth was not a given in 1968 when the lease was made.

Examining the lease as a whole, it is apparent that the then owner desired to have an investor/builder build housing as specified on Tracts A and B which would be in keeping with the general area. Also, Tract C was so restricted until 1988. While, as pointed out by tenant, at the conclusion of the 50-year lease, the improvements revert to the owner, that does not detract from the fact that, until then, the rentals made in this 30-acre area of Buckhead on leases and subleases are for the tenant. Further, the tenant was given carte blanche in the development of Tract D and has enjoyed and will continue to enjoy the income from it.

In return, the landlord agreed to slowly escalating rents of fixed sums for the first 25 years of the lease. Thereafter, the landlord specified a set floor, but no ceiling other than the formula based on the escalation of the value of the property in that period of time. It increased greatly.

Despite the tenant's efforts to dissect, examine, and engraft paragraphs 7, 15 and 23 to create an argument that only the remaining 25-year estate is to be valued as the "leased land" by the appraisers, neither the court below nor this court is persuaded. Tenant dwells with some intensity on a comma between "lease" and "except" in paragraph 7 to reason that the clause following the comma must refer not only to the immediately preceding clause, "not encumbered by this lease," but also to "as though there were no improvements on the leased land."

" 'Punctuation is no part of the English language. The Supreme Court says that it "is a most fallible guide by which to interpret a writing." *Ewing v. Burnet*, 11 Pet. 41, 54 (9th L. ed. 624). The Century Dictionary tells us, what is common knowledge, that "there is still much uncertainty and arbitrariness in punctuation." *It is always subordinate to the text, and is never allowed to control its meaning.* The court will take the contract by its four corners, and determine its meaning from its language, and, having ascertained from the arrangement of its words what its meaning is, will construe it accordingly, without regard to the punctuation marks, or the want of them. The sense of a contract is gathered from its words and their relation to each other, and after that has been done, punctuation may be used to more readily point out the division in the sentences and parts of sentences. But the words control the punctuation marks, and not the punctuation marks the words.' [*Holmes v. Phenix Ins. Co.*, 98 Fed. 240 (2) (47 L. R. A. 308) (1899)]. It is quite true that the meaning of isolated sentences may be changed most materially by a mere varying of the punctuation; but as each sentence of a contract must be stud-

ied in the light of all the others, so must its punctuation be subordinate to the effect of the whole instrument." (Emphasis supplied.) *Bridges v. Home Guano Co.*, 33 Ga. App. 305, 311 (125 SE 872) (1924) See *U3S Corp. v. Parker*, 202 Ga. App. 374, 377 (2) (414 SE2d 513) (1991).

Also, tenant's reliance on *Trust Co. of Ga. v. S. & W. Cafeteria*, 97 Ga. App. 268 (103 SE2d 63) (1958) does not persuade us otherwise. As pointed out in that case, "premises" can be used to refer either to an estate for years or the realty itself, depending upon the intent of the parties. Id. at 281.

3. Assuming without deciding that the admissions made by Grant III and Trust Company are subject to the interpretation given them by tenant, *Piedmont Aviation v. Washington*, 181 Ga. App. 730, 731 (2) (353 SE2d 847) (1987), this still does not mandate the conclusion that the original drafters' intent is altered thereby.

*Case No. A93A2378*

4. The owner/landlord cross-appeals the trial court's determination that the appraisers were required to determine the value of the leased land "as of the first day of the 25th year," i.e., June 1, 1992, without considering later sales information.

For the same reasons stated above, this is what the parties agreed and this is the determinative date.

5. We have not considered matters not of record before us, with the exception of census figures judicially noticed, and, therefore, tenant's motion to strike portions of the brief of owner/landlord is denied.

*Judgment affirmed in Case No. A93A2377. Pope, C. J., and Birdsong, P. J., concur. Judgment affirmed in Case No. A93A2378. Pope, C. J., and Birdsong, P. J., concur.*

DECIDED MARCH 15, 1994 —
RECONSIDERATION DENIED MARCH 29, 1994 —

*Morris, Manning & Martin, Bruce C. Smith, Nicholas N. Sears, William M. Reid, William J. Sheppard*, for appellant.
*Alston & Bird, G. Conley Ingram, James C. Grant*, for appellees.

